UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CAROL CONIGLIO, | **DECISION** |
| | **and** |
| Plaintiff, | **ORDER** |
| v. | |
| | **03-CV-028F** |
| JO ANNE B. BARNHART, | |
| COMMISSIONER OF SOCIAL SECURITY, | **(consent)** |
| Defendant. | |

APPEARANCES:          ALBERT V. LOWMAN, JR., ESQ.
                      Erie County Department of Social Services
                       Office of Counsel
                      Attorney for Plaintiff
                      43 Court Street, 4th Floor
                      Buffalo, New York 14202

                      TERRANCE P. FLYNN
                      UNITED STATES ATTORNEY
                      Attorney for Defendant
                      JANE B. WOLFE
                      Assistant United States Attorney, of Counsel
                      Federal Centre
                      138 Delaware Avenue
                      Buffalo, New York 14202

## JURISDICTION

On November 10, 2003, the parties to this action consented, pursuant to 28

U.S.C. § 636(c), to proceed before the undersigned.  The matter is presently before the

court on motions for judgment on the pleadings filed by Defendant on September 5,

2003 (Doc. No. 10), and by Plaintiff on November 7, 2003 (Doc. No. 14).

## BACKGROUND

Plaintiff, Carol Coniglio ("Plaintiff" or "Coniglio"), seeks review of Defendant's

decision denying her Social Security Disability Insurance ("SSDI") benefits under Title II

of the Social Security Act ("the Act"), 42 U.S.C. § 401 *et seq.* ("Title II"), and

Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381 *et*

*seq.* ("Title XVI") (together, "disability benefits").  (Doc. No. 14).   In denying Plaintiff's

application for benefits, Defendant determined that although Plaintiff has not, since

January 1, 1996, the alleged onset disability date, engaged in substantial gainful

activity, and suffers from several severe medically determinable impairments, including

insulin-dependent diabetes mellitus, hypertension, peripheral neuropathy, arthritis,

obesity, hypothyroidism, and depression, Plaintiff does not have an impairment or

combination of impairments falling within the Act's definition of impairment.  (R. 27).[1]

The ALJ further determined Defendant's impairments did not render Plaintiff incapable

of performing her past relevant work as an office manager/secretary/billing clerk.  (R.

27).  As such, Defendant found Plaintiff was not disabled as defined by the Act.  (R. 27).

## PROCEDURAL HISTORY

Plaintiff filed for disability benefits on September 9, 1997, alleging she was

disabled by diabetes, arthritis, hypothyroidism, hypertension and obesity. (R. 107-10

(SSDI) and R. 398-403 (SSI)).   Those applications were denied initially on December 5,

1997 (R. 74, 404-05) and, upon reconsideration, on February 6, 1998.  (R. 75, 409-12).

On April 10, 1998, Plaintiff requested an administrative hearing as to those denials.  (R.

93-94).  That request was granted and a hearing was held on January 28, 1999, before

---

[1] "R." references are to the page numbers of the administrative record submitted in this case for the court's review.

an ALJ of the SSA ("SSA") Office of Hearings and Appeals.  (R. 32-73, 101-02).
Plaintiff, who was represented at the hearing by Darlene Sikorski ("Ms. Sikorski"), a
paralegal with the Erie County Department of Social Services ("DSS") Officer of
Counsel, appeared and testified at the hearing.  (R. 34).

On March 20, 1998, the ALJ denied disability benefits to Plaintiff (R. 14-31), who
requested review of the ALJ's decision by the SSA Appeals Council ("Appeals Council").
(R. 12-13).  Plaintiff requested and was granted permission to submit additional records
to the Appeals Council for consideration.  (R. 8).  On December 6, 2002, the Appeals
Council determined that neither the record nor the additional records submitted provided
any basis for granting the review, concluding that the ALJ's decision was the final
decision on Plaintiff's claim.  (R. 6-7).

Thereafter, on January 15, 2003, Plaintiff filed this action seeking review of the
administrative decision.  (Doc. No. 1).  Defendant's answer was filed on April 30, 2003,
(Doc. No. 6), along with a copy of the Administrative Record.  A Supplement to the
Answer, consisting of pages inadvertently omitted from the Administrative Record filed
on April 30, 2003, was filed on May 14, 2003 (Doc. No. 7) ("AR Supplement").  On
September 5, 2003, Defendant filed motion for judgment on the pleadings (Doc. No. 10)
("Defendant's Motion") and a Memorandum of Law in Support of the Commissioner's
Motion for Judgment on the Pleadings (Doc. No. 11) ("Defendant's Memorandum").  On
November 7, 2003, Plaintiff filed a cross-motion for judgment on the pleadings (Doc. No.
14) ("Plaintiff's Motion"), supported by the attached Memorandum of Law in Support of
Plaintiff's Motion for Judgment on the Pleadings ("Plaintiff's Memorandum").  On
November 25, 2003, Defendant filed Commissioner's Reply Memorandum of Law (Doc.

No. 18), opposing Plaintiff's motion and in further support of Defendant's motion ("Defendant's Reply").

Based on the following, Defendant's motion for judgment on the pleadings (Doc. No. 10) is GRANTED, and Plaintiff's cross-motion for judgment on the pleadings (Doc. No. 14) is DENIED.

## **FACTS**[2]

As of January 28, 1999, the date of the hearing before the ALJ, Plaintiff, who is not married and lives alone, was 56 years old, stood 5'7", weighed approximately 250 pounds and was unemployed.  (R. 36-38).  Plaintiff completed high school and attended a business school for one year to learn typing and computer skills.  (R. 37).  Plaintiff alleges she is disabled by Type II diabetes mellitus, requiring daily insulin injections, arthritis, obesity, hypothyroidism and hypertension.  (R. 44, 107, 120).   Since January 1, 1996, the alleged onset disability date, Plaintiff has received public assistance, but has not received workers compensation.  (R. 38).  That Plaintiff met the insured status requirements of the Social Security Act relative to Title II SSDI benefits from the alleged onset date of disability, January 1, 1996, through December 31, 1998 is undisputed.  (R. 17, 20; Plaintiff's Memorandum at 3).

From February 1, 1996 through December 16, 1998, Plaintiff was followed for several chronic conditions at the outpatient clinic ("the clinic")[3] at Millard Fillmore

---

[2] Taken from the pleadings and Administrative Record filed in this action.

[3] Although Plaintiff was treated by several physicians at the clinic, the progress notes relative to such treatment do not always indicate the name of the attending physician, or the name is illegible. Accordingly, the fact statement only identifies the attending physician when it is possible to determine such physician's name from the record.

Hospital ("Millard Fillmore"), where Plaintiff was repeatedly diagnosed with cellulitis (acute inflammation of the connective tissues of the skin caused by bacterial infection), diabetes mellitus, hypothyroidism and a benign breast mass (*see*, generally, R. 158-205, 318-88).  Upon examination at the clinic on February 1, 1996, Plaintiff's blood pressure was 122/85, blood sugar was in excess of 400, and Glucophage (oral diabetes medication to lower blood sugar) was prescribed. (R. 260).

Upon examination at the clinic on July 9, 1996, by Maureen M. Dlugozima, M.D. ("Dr. Dlugozima"), Plaintiff reported she felt well and tried to walk a few times a week for exercise.  (R. 320).  Plaintiff's blood pressure was 142/90 and blood sugar was between 300 and 400 and Plaintiff's insulin dosage was increased to 40 units twice a day.  (R. 320).

On July 18, 1996, Plaintiff was admitted to Millard Fillmore for cellulitis of her right upper extremity lasting six days and for which oral antibiotics had been ineffective.  (R. 158-73; 383-87).  An X-ray taken of Plaintiff's right elbow on July 18, 1996 revealed "somewhat greater soft tissue swelling about the elbow."  (R. 201).  Plaintiff responded well to intravenously administered antibiotics and was discharged on July 22, 1996 with a prescription for a 14-day course of oral antibiotics.  (R. 158-59).

On July 30, 1996, Plaintiff was examined at the clinic by Dr. Dlugozima who noted Plaintiff's blood sugar levels had improved to 130 and 220, although her blood pressure remained elevated.  (R. 321).  Dr. Dlugozima's progress notes indicate Plaintiff was instructed to finish her antibiotics for the cellulitis and, if necessary, antibiotics would be prescribed for an additional week. (R. 321).  Further, Plaintiff's inability to lose weight was considered secondary to the amount of Plaintiff's insulin and Plaintiff was

advised to walk.  (R. 321).  Dr. Dlugozima noted Plaintiff had not been working because of her cellulitis and had requested a Social Security form be completed.  (R. 321).

Plaintiff telephoned the clinic on August 2, 1996 to request another course of antibiotics for her cellulitis and the prescription was placed over the telephone at Plaintiff's pharmacy.  (R. 321).  On August 14, 1996, Plaintiff telephoned the clinic and reported the cellulitis, although improved, was still present and Plaintiff was advised to report to the clinic for an evaluation.  (R. 322).  Upon examination at the clinic on September 4, 1996, Plaintiff's blood pressure was 135/90 which Dr. Dlugozima characterized as "ok today."  (R. 322).

Plaintiff was next examined at the clinic on November 12, 1996 with regard to complaints of pain in her hands and right lower back.  (R. 175, 323).  Dr. Dlugozima's progress treatment notes reflect Plaintiff's "long standing" history of arthritis for which Plaintiff took over-the-counter arthritis medications which provided minimal relief. (R. 175, 323).  Plaintiff reported her hand pain was worse at night and her back pain worse after sitting for long periods of time.  (R. 175, 323).  Bilaterally, neurological examination revealed two-plus reflexes and negative straight leg raising, good strength, and toe-heel walk was without difficulty.  (R. 175-76, 323-24).  Blood pressure was 150/90.  (R. 175, 323).  Dr. Dlugozima diagnosed borderline high blood pressure and arthritis for which Vasotec (antihypertensive medication) and Daypro (non-steroidal anti-inflammatory medication) were prescribed.  (R. 175-76, 323-24).

Upon examination on December 11, 1996, Plaintiff reported tolerating Vasotec well, but that Daypro made her sick.  (R. 324).  Plaintiff's blood pressure was 130/82. (R. 176, 324).  Dr. Dlugozima gave Plaintiff samples of Relafen for arthritis.  (R. 177,

325).   On January 3, 1997, Plaintiff reported the Relafen was effective and requested a prescription for the same.  (R. 177, 325).

When Plaintiff was examined at the clinic on February 4, 1997, her blood sugar was 299 and her cholesterol was her noted as "high."  (R. 326).  Dr. Dlugozima increased Plaintiff's Glucophage to 850 mg and noted Plaintiff was to take Zocor for cholesterol.  (R. 327-28).

Upon examination by Dr. Dlugozima on March 26, 1997, Plaintiff's blood pressure was 130/80, and she weighed 246 pounds.  (R. 327).  Plaintiff reported a dry cough, for which Dr. Dlugozima prescribed Cozaar, along with Zocor for Plaintiff's high cholesterol, and renewed Plaintiff's Relafen prescription.  (R. 327-28).  Dr. Dlugozima reported she was "very hesitant to up [Plaintiff's] insulin when weight loss would really be the best option," and encouraged Plaintiff to lose weight.  (R. 327).

Plaintiff was next examined by Dr. Dlugozima on April 30, 1997, for back pain that improved after resting, applying heat, and taking medication.  (R. 313, 329). Plaintiff's blood pressure was 140/84.  (R. 181, 313, 329).  Upon examination at the clinic on May 21, 1997, Plaintiff's blood pressure was 148/90 and blood sugar was reported as "200s."  (R. 329).  Plaintiff continued to complain of back pain, although she tolerated Zocor without any problems.  (R. 313, 329).  Dr. Dlugozima opined Plaintiff's diabetes was uncontrolled and reiterated the need for Plaintiff to lose weight. (R. 182, 312, 330).

Plaintiff returned to the clinic on July 16, 1997 and reported her blood sugar was "mostly" less than 200.  (R. 182, 312, 330).  Plaintiff weighed 247 pounds, and her blood pressure was 138/80.  (R. 182, 312, 330).

Plaintiff applied for disability benefits on September 9, 1997.  (R. 107-35).  On forms completed in connection with such application, Plaintiff indicated she became disabled in January 1996, and her disabling conditions included diabetes, arthritis of the hands and back, knees and feet, hypothyroidism, hypertension and obesity.  (R. 120). Plaintiff explained that arthritis pain rendered her unable to type or manipulate with her hands, and caused her feet to go numb after sitting for a long period of time.   (R. 120). Among the daily activities listed by Plaintiff are shopping with her niece and using the grocery cart like a walker, using a baby buggy to walk or stroll, cooking for herself, light dusting and slow cleaning.  (R. 123).  Plaintiff would visit with her niece who lived two houses away, and did not drive, but depended on others for rides.  (R. 123).

When Plaintiff was next examined at the clinic on September 17, 1997, her prescriptions were refilled.  (R. 312, 332).  At that time, Plaintiff reported a burning sensation in her toes which became worse at night and which Margo J. Krasnoff, M.D. ("Dr. Krasnoff") determined was likely caused by neuropathy (nerve disorder resulting in pain and numbness).  (R. 310, 332).  Dr. Krasnoff referred Plaintiff for physical therapy for arthritis.  (R. 185, 214, 310, 332).

Plaintiff was seen by Dr. Krasnoff on November 12, 1997, and reported that Relafen had provided little relief, however "[s]he tried a friend's Motrin and her pain was significantly better."  (R. 216, 258, 335).  Amitriptyline, an antidepressant which had been prescribed as a sleep aid for Plaintiff, was reported as "marginally" effective and the dosage was increased.  (R. 216, 335).  Plaintiff's blood pressure was 140/88, she weighed 244 pounds, and a musculoskeletal exam demonstrated bilateral shoulder bursitis.  (R. 216, 335).  Dr. Krasnoff referred Plaintiff to Paresh Dandona, M.D. ("Dr.

Dandona"), an endocrinologist, regarding Plaintiff's hemoglobin AIC (blood test which
determines blood sugar level over the past few months).  (R. 216, 335).  In the referral
to Dr. Dandona, Dr. Krasnoff advised that Plaintiff "does not do regular home blood
glucose monitoring . . . does not follow her diet strictly . . . needs assistance with
dietician, home blood glucose monitoring, as well [*sic*] modification in her insulin
regimen."  (R. 258).

Ashraf Azeb, M.D. ("Dr. Azeb"), examined Plaintiff on November 12, 1997 on a
consultative basis relative to Plaintiff's Social Security disability benefits application.  (R.
209-10).  Plaintiff reported suffering from constant lower back pain, arthritis in her
fingers and diabetes, and stated that in 1972, a machine at work smashed two fingers
on her right hand for which re-constructive surgery was required. (R. 209-10).  Plaintiff
was 5' 6 3/4" tall, weighed 246 pounds and her blood pressure was 149/90.  (R. 209).
Dr. Azeb noted Plaintiff appeared depressed and succumbed to crying spells during the
exam.  (R. 210).

Neurological examination revealed Plaintiff was alert and oriented to time, place
and person, had intact sensation to vibration and touch, intact cranial nerves, gait is
normal, fine movements intact, grip reflexes and muscle strength were +5 bilaterally,
and deep tendon reflexes were symmetrical bilaterally.  (R. 210).  Musculoskeletal
examination revealed a deformity of Plaintiff's right middle finger indicative of Plaintiff's
previous accident and surgery, although Dr. Azeb did not observe any "arthritis kind of
deformities" about Plaintiff's hands.  (R. 210).   Dr. Azeb opined that Plaintiff's hand
swelling was likely caused by rheumatoid arthritis or osteoarthritis and stated "maybe
lab work for rheumatoid arthritis or rheumatoid factor with sedimentation rate would be

helpful to determine if there is any flare-up of her arthritis kind of symptoms." (R. 210).

Dr. Azeb reported that

> [r]ange-of-motion is difficult for some maneuvers because [Plaintiff] is claiming that she cannot do it.  Her shoulder, for example, she is claiming that she cannot lift her shoulder up or do any flexion/extension, or any rotation or abduction/adduction.  However, when I stated to [Plaintiff] that she had to try, then she shows full range-of-motion of both shoulders as you see from the range-of-motion sheet.

(R. 210).

On the Range of Motion chart completed by Dr. Azeb, Plaintiff is reported as having full range of motion, but refusing to demonstrate lumbar flexion-extension and lateral flexion.  (R. 207-208).

Dr. Azeb opined the back pain Plaintiff described at this visit was likely caused by diabetic amyotrophy (a type of neuropathy caused by diabetes), which he identified as a "kind of diabetic neuropathy, more than any disc problem or arthritis." (R. 210).  Dr. Azeb attributed Plaintiff's hand swelling to rheumatoid arthritis or osteoarthritis.  (R. 210).  An X-ray of Plaintiff's lumbosacral spine taken on November 17, 1997 revealed the existence of anterior spurs and facet joint sclerosis.  (R. 206).

Plaintiff's ability to perform work-related activities was assessed on December 5, 1997, by State agency medical consultant Jon S. Miller, M.D. ("Dr. Miller"), who reported Plaintiff's primary diagnosis as arthritis and secondary diagnosis as diabetes mellitus. (R. 225-32).  Dr. Miller opined Plaintiff could lift and carry up to 25 pounds frequently and up to 50 pounds occasionally, stand and walk, or sit, for six hours in an eight-hour workday and had an unlimited ability to push or pull.  (R. 226).  Plaintiff had no postural, manipulative, visual, communicative or environmental limitations.  (R. 227-29).  Dr.

Miller's assessment was affirmed on February 6, 1998 by State agency Review Physician Mathew K. Alukal, M.D.  (R. 232).

When Plaintiff next consulted with Dr. Krasnoff on January 14, 1998, she admitted she still had not seen Dr. Dandona.  (R. 218).  Plaintiff revealed that since November of 1997, she began taking Motrin for her shoulder pain which has significantly reduced both shoulder discomfort and hand pain.  (R. 218).  Plaintiff's blood pressure was 140/80, and she weighed 244 ½ pounds.  (R. 218).

On January 20, 1998, Plaintiff was examined at the clinic and her diabetes mellitus was reported as "out of control" with blood sugar at 386.  (R. 219).  Dr. Krasnoff increased Plaintiff's insulin dosage and emphasized to Plaintiff the need to contact Dr. Dandona, for whom Dr. Krasnoff had prepared a referral letter on November 14, 1997.  (R. 219).

Upon examination on March 5, 1998, Plaintiff complained of insomnia and frequent urination at night.  (R. 261).  Her diet was "uncontrolled," her blood sugar was 392, she weighed 241 pounds and her blood pressure was 120/76.  (R. 261).  Plaintiff's Glucophage and insulin dosages were increased.  (R. 262).  Plaintiff was examined at the clinic by Julie A. Szumigala, M.D. ("Dr. Szumigala"), on April 9, 1998, when she weighed 243 ½ pounds and her blood sugar was 375.  (R. 262).  Plaintiff was placed on a restricted diet.  (R. 263).  Clinical laboratory test results dated April 20, 1998 showed abnormal thyroid and urinalysis.  (R. 259).

On May 28, 1998, Plaintiff was examined by Dr. Dandona at the Diabetes-Endocrinology Center of WNY ("the diabetes center") of Millard Fillmore Health System.  (R. 264).  Plaintiff's blood sugar and weight were 287 and 244 ½ pounds, respectively

and no lesions were present on Plaintiff's feet, although examination revealed decreased touch and pain sensations, and Plaintiff demonstrated "poor glucose control." (R. 264-65).  On July 1, 1998, Gerardo Negron, M.D., Ph.D. ("Dr. Negron") examined Plaintiff at the diabetes center and reported Plaintiff's blood sugar was 371, she weighed 244 pounds and psoriasis (skin disease characterized by lesions on the skin) was spreading.  (R. 266).

Upon examination by Dr. Dandona at the diabetes center on July 17, 1998, Plaintiff complained of "feeling unwell," her blood sugar was 364, her blood pressure was 136/80, and she weighed 245 ½ pounds.  (R. 268).  Plaintiff complained she suffered from the flu, had numbness and tingling in her feet, and felt weak.  (R. 268). The attending physician determined Plaintiff had mild proximal myopathy (muscle tissue disorder), palpable pulses, diminished sensations up to her knees, and knee jerks which were negative bilaterally.  (R. 269).  Plaintiff was described as "obese," her "limbs seem disproportionately thin," and psoriasis lesions were noted on Plaintiff's limbs.  (R. 269).

At Plaintiff's next examination by Dr. Dandona at the diabetes center on August 4, 1998, Plaintiff's blood sugar was 325, her blood pressure was 130/80, she weighed 244 ½ pounds, and complained of pain in her feet.  (R. 270).  Plaintiff's diagnosis was Type II diabetes mellitus, hypothyroidism and neuropathy.  (R. 270).  Plaintiff's insulin dosage was increased to 80 units twice a day.  (R. 271).

An X-ray of Plaintiff's left foot taken on August 19, 1998 revealed "a slightly displaced avulsion fracture[4] fragment off the lateral base of the proximal phalanx [bone

---

[4] "An avulsion fracture occurs when an injury causes a ligament or tendon to tear off (avulse) a small piece of a bone to which it is attached.  Serious injury to the involved ligament or tendon may also

at base of toe] of the great toe," and "a slightly displaced and rotated avulsion fraction off the medial base of the proximal phalanx of the left second toe." (R. 257) (bracketed text added).  "A bony density paralleling the base of the proximal phalanx of the left third toe" was considered evidence of a recent avulsion fracture, and dorsal and plantar calcaneal (heel bone) spurs were present.  (R. 257).

According to the diabetes center's progress notes, upon examination by Dr. Dandona on August 27, 1998, Plaintiff weighed 247 pounds, her blood sugar was 221 and blood pressure was 120/70, and diagnosis was Type II Diabetes Mellitus, hypothyroidism, neuropathy, prosiasis and obesity and insulin dosage was increased to 100 units twice a day.  (R. 272-73).  Plaintiff's foot fracture was healing, but redness over the toes bilaterally and edema (swelling) in the left foot up to the ankle were noted, and another X-ray of Plaintiff's left foot was ordered.  (R. 272-73).  The X-ray of Plaintiff's left foot, taken September 12, 1998 was compared with the August 11, 1998 X-ray and showed "no significant interval change in the avulsion fractures of the first, second and third proximal phalanges."  (R. 256).

On September 23, 1998, Plaintiff complained to Dr. Dandona of swelling in her foot by the end of the day.  (R. 274).  Her blood sugar was 259, blood pressure was 130/90, and she weighed 250 pounds. (R. 274).  Plaintiff was not taking her Rezulin properly, and Dr. Dandona instructed her to take Rezulin in the correct dose.  (R. 275).  When Plaintiff was examined by Dr. Dandona on October 8, 1998, her blood sugar had dropped to 175, her weight was 247 ½ pounds and her blood pressure was 140/80.  (R.

---

be present."  Avulsion Fracture, *taken from* A-Z HealthGuide from WebMD, *available at* http://www.webmd.com/hw/health_guide_atoz/tv7924.asp.

276).  Edema and tenderness in Plaintiff's right ankle and toes was present on physical

examination.  (R. 277).

On October 18, 1998, Plaintiff was admitted by Robert J. Lascola, M.D. ("Dr.

Lascola") to Millard Fillmore Hospital for treatment of osteomyelitis (inflammatory

disease of bone frequently caused by bacteria) of her left foot.  (R. 371-82).  An X-ray of

Plaintiff's left foot, taken October 18, 1998 and compared with the August 11 and

September 12, 1998 X-rays showed a "linear metallic foreign body" located near the

base of Plaintiff's fourth and fifth metatarsals (toes) that was not previously present.  (R.

291, 353, 380, 395).  The avulsion fractures identified on the earlier X-rays were again

identified with "some bony resorption of the avulsion fracture at the based of the second

proximal phalanx."  (R. 291, 353, 380, 395).  Also seen were "chronic deformity of the

distal shaft of the left fifth metatarsal" without evidence of acute bone destruction; dorsal

and plantar calcaneal spurs were present.  (R. 291, 353, 380, 395).  The reviewing

physician's impression was interval development of a metallic foreign body in the plantar

aspect of the foot at the base of the fourth and fifth metatarsals which appeared to be

the distal (tapered) end of a syringe needle.[5]  (R. 291, 353, 380, 395).  A bone scan of

Plaintiff's left foot revealed osteomyelitis in the third metatarsal phalangeal joint.  (R.

293, 351, 394).  On October 17, 1998, Plaintiff underwent incision and drainage of the

deep plantar space in the third and fourth toes without complication and was started on

---

[5] Although not specifically stated, the record suggests that the needle fragment was from a
syringe Plaintiff used for insulin injection to control her diabetes, and became embedded in Plaintiff's foot
after Plaintiff stepped on it.  (*See* R. 56 (Plaintiff testifying at administrative hearing that needle fragment in
her foot is from syringe used for insulin injections); R. 300-01 (Dr. Krasnoff's Progress Record based on
November 24, 1998 examination reporting Plaintiff stepped on needle and had consulted with Dr.
Davidson concerning removal of the needle under local anesthesia)).

intravenous antibiotics.  (R. 371).  While admitted, Plaintiff maintained adequate treatment of her glucose intolerance and, on October 23, 1998, Plaintiff was discharged in guarded condition.  (R. 371-72).

When Plaintiff was examined by Dr. Dandona at the diabetes center on November 5, 1998, her foot showed improvement, blood sugar was 162, blood pressure was 140/89 and she weighed 252 ½ pounds.  (R. 278).  Physical examination revealed bilateral edema of her feet, sensation was diminished up to her knees and knee and ankle jerks were negative bilaterally.  (R. 279).

In a "Medical Report for Determination of Disability," completed by Dr. Dandona on November 5, 1998, in connection with Plaintiff's disability benefits application, Plaintiff's diagnoses are listed as Type II diabetes mellitus, nephropathy,[6] neuropathy, menopause, obesity and hypothyroidism.  (R. 392-93).  Plaintiff's weight was reported as 252 ½ pounds, and blood pressure was 140/84.  (R. 392).  According to Dr. Dandona, Plaintiff was capable of performing sedentary work, defined as lifting 10 pounds occasionally, standing and walking two hours and sitting six hours in an eight-hour workday, and had use of hands for manipulation.  (R. 392).  Dr. Dandona found Plaintiff's extremities were normal and no mental signs or symptoms were present upon examination.  (R. 392-93).  Plaintiff was not considered to have a marked restriction of daily activities and Dr. Dandona was unaware of Plaintiff's ability to relate to other people.  (R. 393).  Plaintiff was not anticipated to recover from her impairments; rather,

---

[6] Nephropathy is a type of kidney disease characterized by high levels of protein in the urine, resulting in loss of kidney function.  Diabetics are at an increased risk for developing nephropathy, especially if their blood sugar is poorly controlled.  Once nephropathy develops, however, patients with uncontrolled blood pressure face the greatest rate of progression of the disease. Nephropathy in Diabetes, *available at* http://www.care.diabetesjournal.org/cgi/content/full/27/suppl_1/s79.

Plaintiff's treatment were intended to control her impairments.  (R. 393).

Dr. Dandona examined Plaintiff on November 18, 1998, when Plaintiff's blood sugar of 178 was noted as "really good."  (R. 280.  Plaintiff's weight was 251 pounds and blood pressure was 140/90.  (R. 280).  Plaintiff was to continue receiving intravenous antibiotics for four to five weeks.  (R. 280).

On November 24, 1998, Plaintiff was examined at the clinic by Dr. Krasnoff with regard to Plaintiff's osteomyelitis.  (R. 300).  Dr. Krasnoff reported Plaintiff fractured her first three toes in August 1998 and had an ulcer on her left foot six weeks later.  (R. 300).  Dr. Krasnoff had yet to receive any report from the October 17, 1998 incision and drainage procedure.  (R. 300).  Since beginning treatment with Dr. Dandona, Plaintiff's blood sugar was lower.  (R. 300).  Dr. Krasnoff observed Plaintiff was worried about losing her left foot and requested a consultation with podiatrist David M. Davidson, DPM, ("Dr. Davidson") regarding removal of the needle fragment in Plaintiff's left foot. (R. 300).

Upon examination, Plaintiff weighed 254 pounds, and her blood pressure was 130/80.  (R. 300).  Plaintiff had an open ulcer at the base of the left third toe with a sanguineous drainage, but no surrounding erythema, and eczema on Plaintiff's right forearm "appear[ed] quite severe."  (R. 300).  Dr. Krasnoff's assessment including diabetes, for which Plaintiff was being followed by Dr. Dandona, hypothyroidism, for which her synthroid was increased, eczema for which medication was prescribed, stable hypertension, and left foot pain considered a component of peripheral neuropathy.  (R. 300).  According to Dr. Krasnoff's clinic note dated December 1, 1998, Plaintiff was examined by Dr. Davidson who found no symptoms of osteomyelitis and her ulcer

looked good.  (R. 301).  Dr. Davidson fabricated a splint to decrease the weight on

Plaintiff's toes, her blood sugar was "well controlled," and the needle fragment in

Plaintiff's left foot was to be removed under local anesthesia.  (R. 301).

On a Medical Report for Determination of Disability completed on January 21,

1999, Dr. Lascola reported Plaintiff was diagnosed with ulceration of the right foot,[7] had

a marked restriction of daily activities, was not seriously impaired in her ability to relate

to other people, was unable to perform her usual work or any other type of work, but

was expected to recover, at least in part.  (R. 390-91).

Plaintiff, represented by Ms. Sikorski, appeared and testified at the January 28,

1999 hearing before the ALJ.  (R. 32-73).  Plaintiff's most recently worked for a

plumbing and heating company as a full-time secretary, for which Plaintiff used a

dictaphone, typed letters, filed, answered telephones and prepared billing invoices.  (R.

38-39, 51).  Plaintiff left the company in May 1993 when the owner died.  (R. 45).

Previously, Plaintiff had worked for Buff Core Manufacturing ("Buff Core") from 1971

until 1986, when the company closed. (R. 40, 46).  Plaintiff began her employment with

Buff Core as a packer, eventually moved up to a lead clerk position in the Buff Core

warehouse, training five or six other workers or clerks to fill inventory orders.  (R. 41,

45).  Such work required Plaintiff to stand and walk for most of her eight hour days, with

little time for sitting.  (R. 42).  Plaintiff testified that while employed by Buff Core she

moved jewelry cases that weighed between 20 and 30 pounds.  (R. 43).

---

[7] Although Dr. Lascola refers to Plaintiff having an ulceration of her *right* foot, treatment notes from
Plaintiff's October 1998 hospitalization indicate that Dr. Lascola treated Plaintiff for osteomyelitis of her *left*
foot, including incision and drainage.  (R. 371-82).  In fact, nowhere else within the record is there any
mention of Plaintiff having an ulceration on her right foot and, as such, the court treats such reference by
Dr. Lascola as an inadvertent error.

In response to the ALJ's questioning, Plaintiff identified her main problem as a burning sensation on the soles of her feet, especially her left foot.  (R. 46, 55).  Plaintiff stated she had surgery to remove an ulcer on her foot on October 17, 1998, during which a hypodermic needle from a syringe was discovered inside her foot and which was scheduled to be removed on February 2, 1999.  (R. 55-56, 59).  Plaintiff contends the burning sensation she experiences in her feet preceded the surgical removal of the ulceration, and that since the surgery, the scab from the ulcer adversely affects her ability to walk.  (R. 58-59).

Plaintiff testified she could stand for a half hour and sit for no longer than one hour before her feet became numb and painful and she experienced low, right side back pain.  (R. 58-59).  Plaintiff complained of swelling in her arms and joints of her hands, as well as itchiness in her hands.  (R. 60).  Plaintiff's decreased hand strength makes it difficult to open jars and she experiences numbness in her fingertips.  (R. 61).  Plaintiff reported difficulty sleeping and attributed to the problems with her hands and feet.  (R. 61).

In addition to these impairments, Plaintiff testified that she suffered from depression, indicating that she became tearful frequently, but denied consulting a psychiatrist, psychologist or counselor for this condition.  (R. 61-62, 66-67).  Plaintiff attributed her depression to her inability to pursue her previous activities, such as shopping, working and bowling.  (R. 66).  When shopping, Plaintiff was accompanied by her niece.  (R. 66).  Plaintiff reads books and the newspaper, although she is sometimes unable to follow the stories contained therein.  (R. 68).  Plaintiff's daily activities include doing dishes or eating breakfast, then sitting for a while before she got

up and walked around the house.  (R. 68).  Plaintiff testified that her inability to stand

prevents her from cooking, mopping the floor or doing laundry, but she is able to dust

the furniture and fold clothes.  (R. 69-70).  Plaintiff explained that her niece, who lives

nearby, assists her with cooking, laundry and cleaning.  (R. 69).

The ALJ denied Plaintiff disability benefits on March 20, 1999. (R. 6).  In denying

the claim, the ALJ found that Plaintiff's disabilities precluded only the following work-

related activities: standing and/or walking for more than two hours in an eight-hour

workday, lifting more than ten pounds occasionally, or five pounds frequently, and more

than a moderate ability to concentrate.  (R. 21).

In connection with Plaintiff's request for review of the ALJ's decision, Plaintiff

submitted to the Appeals Council reports from Dr. Krasnoff, dated January 19, 1999

("Dr. Krasnoff's report") (R. 413-14), and Dr. Davidson, dated January 20, 1999 ("Dr.

Davidson's report") (R. 415-16), and a letter from Ms. Sikorski, dated May 3, 1999

("Sikorski letter") (R. 417-18).  (R. 8).  Dr. Kransnoff's reported when she last examined

Plaintiff on November 24, 1998, Plaintiff's diagnoses included diabetes, arthritis,

hypothyroidism, a history of osteomyelitis and hypertension.  The onset for Plaintiff's left

foot osteomyelitis, for which surgical debridgement was performed and intravenous

antibiotics were used, was October 1998.  (R. 413).  As of the date of Dr. Krasnoff's

report, Plaintiff was unable to stand on her foot and had an open ulcer at the base of her

left third toe.  (R. 413).  According to Dr. Krasnoff, Plaintiff had a marked restriction of

daily activities, was not seriously impaired in her ability to relate to other people, and

was not able to perform any work, although Plaintiff was expected to recover, "at least in

part" and the impairment was not expected to last for at least one year.  (R. 414).

In Dr. Davidson's report, Plaintiff was diagnosed as "diabetic" with a "foreign body in [her] left foot."  (R. 415).  According to Dr. Davidson, Plaintiff was capable of performing sedentary work, but not until after the needle fragment was surgically removed from Plaintiff's left foot.  (R. 415).  Dr. Davidson found Plaintiff was markedly restricted as to her daily activities.  (R. 415).  Although Dr. Davidson determined Plaintiff was incapable of performing her usual work, he found Plaintiff capable of performing other work, expected her to recover, at least in part, and anticipated significant improvement through medical treatment or rehabilitation.  (R. 416).  Dr. Davidson did not expect the impairment to last for one year or more, noting the impairment should terminate four weeks after the surgical removal of the needle fragment, which was scheduled for February 2, 1999.  (R. 416).

Ms. Sikorski argued that the ALJ's opinion that the medical evidence establishes Plaintiff is capable of performing sedentary work, including her past work, is not supported by the record and that testimony from a medical expert is required "to clarify claimant's degree of disability."  (R. 417-18).

## DISCUSSION

**1.    Disability Determination Under the Social Security Act**

An individual is entitled to disability insurance benefits under the Social Security Act if the individual is unable:

. . . to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . . An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.

42 U.S.C. § 423(d)(1)(2).

Once the claimant proves she is severely impaired and is unable to perform any past relevant work, the burden shifts to the Commissioner to prove that there is alternative employment in the national economy suitable to the claimant. *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980).

### A.    Standard and Scope of Judicial Review

The standard of review for courts reviewing administrative findings regarding SSDI benefits, 42 U.S.C. §§ 420-433 and SSI benefits, 42 U.S.C. §§ 1381-85, is whether the administrative law judge's findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. National Labor Relations Board*, 305 U.S. 197, 229 (1938) (defining substantial evidence as enough evidence that a reasonable person would "accept as adequate to support a conclusion.")). If substantial evidence supports the factual findings of the Commissioner, the Commissioner's findings are conclusive. 42 U.S.C. § 405(g).

When the Commissioner is evaluating a claim, she must consider "objective

medical facts, diagnoses or medical opinions based on these facts, subjective evidence of pain or disability (testified to by the claimant and others), and . . . educational background, age and work experience." *Dumas v. Schweiker*, 712 F.2d 1545, 1550 (2d Cir. 1983) (quoting *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981)). . If the opinion of the treating physician is supported by medically acceptable techniques, results from frequent examinations and supports the administrative record, the treating physician's opinion will be given controlling weight. [8]   *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993); 20 C.F.R. § 404.1527(d); 20 C.F.R. § 416.927(d), *amended by* 71 Fed. Reg. 16,424-01 (Mar. 31, 2006).  The Commissioner's final determination will be affirmed, absent legal error, if it is supported by substantial evidence. *Dumas v. Schweiker, supra*, at 1550; 42 U.S.C.  § 405(g); 42 U.S.C. § 1383(c)(3), *amended by* Pub. L. No. 109-171, 120 Stat. 4.  "Congress has instructed . . . that the factual findings of the Secretary, [9] if supported by substantial evidence, shall be conclusive." *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied,* 459 U.S. 1212 (1983). However, such judicial review requires the court "examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Mongeur v. Heckler,* 722 F.2d at 1039.  Further, medical evidence submitted to the Appeals Council but not to the ALJ may be considered as part of the record for the

---

[8] The treating physician's opinion is given greater weight because the "continuity if treatment he provides and the doctor/patient relationship he develops place him in a unique position to make a complete and accurate diagnosis of his patient." *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983).

[9] Pursuant to the Social Security Independence and Program Improvements Act of 1994, the function of the Secretary of Health and Human Services in Social Security cases was transferred to the Commissioner of Social Security, effective March 31, 1995.  In accordance with § 106(d) of that Act, the Commissioner of Social Security has been substituted for the Secretary of Health and Human Services as the defendant in this action.

purpose of judicial review.  *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) ("In reviewing

the ALJ's decision, we consider the entire administrative record, including new evidence

submitted to the Appeals Council following the ALJ's decision.").

### B.      Analysis for Disability Benefits Determination

The federal regulations set forth a five-step analysis that the Commissioner must

follow in determining eligibility for disability benefits.  20 C.F.R. §§ 404.1520, 416.920.

*See Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986); *Berry v. Schweiker*, 675 F.2d

464 (2d Cir. 1982).

### 1.      Substantial Gainful Activity

The first step is to determine whether the applicant is engaged in substantial

gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the individual is engaged in

such activity the inquiry ceases and the individual cannot be eligible for disability

benefits.  *Id.*  In the instant case, the ALJ found that Plaintiff had not been engaged in

substantial gainful employment since January 1, 1996, the date of alleged onset of

disability and that finding is undisputed.

### 2.      Severe Physical or Mental Impairment

The next step is to determine whether the applicant has a severe impairment

which significantly limits his physical or mental ability to do "basic work activities."   20

C.F.R. §§ 404.1520(c), 416.920(c).  Absent an impairment, the applicant is not eligible

for disability benefits.  *Id.*

"Basic work activities" are defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. §§ 404.1521(b), 416.921(b).  "Basic work activities" include such physical and mental functions as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, and handling, capacities for seeing, hearing and speaking, ability to understand, carry out and remember simple instructions, use of judgment, appropriately responding to supervision, co-workers and usual work situations, and dealing with changes in a routine work setting.  20 C.F.R. §§ 404.1521(b)(1)-(6), 416.921(b)(1)-(6).  Further, a physical or mental impairment is not severe if it fails to "significantly limit" the applicant's physical and mental ability to do such basic work activities.  20 C.F.R. §§ 404.1521(a), 416.921(a).

The ALJ determined the record establishes Plaintiff suffers from "severe" impairments including insulin-dependent diabetes mellitus, hypertension, peripheral neuropathy, arthritis, obesity, hypothyroidism and depression.  (R. 20).  These findings are undisputed.  However, the ALJ found the evidence failed to establish that Plaintiff's left foot osteomyelitis and right arm cellulitis met twelve-month durational requirements" of the Social Security Act and, as such, could not support a disability claim.[10]  (R. 20).  Plaintiff does not contest this finding.

### 3.    Listing of Impairments, Appendix 1

The third step is to determine whether a claimant's impairment or impairments

---

[10]  The applicant must meet the durational requirement of the Social Security Act which mandates that the impairment must last for at least a twelve month period.  42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1509 and 416.909.

are listed in the regulations at Appendix 1 of 20 C.F.R. Pt. 404, Subpt. P ("the

Appendix").  If the impairment or impairments are listed in the Appendix and the listing's

durational requirements are satisfied, the impairment or impairments are considered

severe enough to prevent an individual from performing any gainful activity and the

individual is deemed disabled, regardless of the applicant's age, education or work

experience.  20 C.F.R. § 404.1525 (a) and 416.925(a); *Melville v. Apfel*, 198 F.3d 45, 51

(2d Cir. 1999) ("if the claimant's impairment is equivalent to one of the listed

impairments, the claimant is considered disabled").  As stated, in the instant case, the

ALJ determined that although Plaintiff suffers from several impairments which interfere

with Plaintiff's ability to perform basic work activity and are thus, by definition, severe,

including insulin-dependent diabetes mellitus, hypertension, peripheral neuropathy,

arthritis, obesity, hypothyroidism, and depression, the evidence does not establish that

any such impairments, either individually or in combination, meets the criteria in the

Listing of Impairments found in Appendix 1.  (R. 20).  Upon review, the court finds that

the ALJ's determination is supported by substantial evidence in the record.

        The relevant listing impairments indicated in Plaintiff's situation are, with regard

to Plaintiff's arthritic condition, 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, §§ 1.02 (major

dysfunction of a joint), 1.03 (reconstructive surgery or surgical arthrodesis of a major

weight-bearing joint), 1.04 (disorders of the spine), 1.08 (soft tissue injury) and 11.14

(peripheral neuropathies).  Other relevant listing impairments include §§ 4.03

(hypertension); 9.02 (thyroid disorders); 9.08 (diabetes mellitus); and 12.04 (affective

disorders).  As to Plaintiff's obesity, when Plaintiff initially filed for disability benefits,

obesity was separately listed as an impairment in § 9.09 of the Listing of Impairments,

and provided that a person is disabled based on obesity if her weight is equal to or greater than the values specified under the regulations, accompanied by one several other impairments.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 9.09 (1999).  Although the record shows Plaintiff is severely overweight, fluctuating between 244 pounds on November 12, 1997 and 250 pounds on the date of the hearing before the ALJ, Plaintiff, to meet the weight requirement under § 9.09 to qualify as disabled based on obesity would have had to weigh at least 282 pounds.  20 C.F.R. Subpt. P, App. 1, § 9.09, Table II.  Therefore, regardless of whether Plaintiff met the criteria for any of the requisite accompanying impairments, because Plaintiff did not meet the requisite weight for her height, the ALJ properly concluded that Plaintiff's obesity did not satisfy the level of severity required by § 9.09.

Effective October 25, 1999, after the date of the ALJ's hearing decidion, § 9.09 was deleted from the Listing of Impairments.  Social Security Ruling ("SSR")[11] 02-1p, Titles II and XVI: Evaluation of Obesity, 2000 WL 628049 * 1 (S.S.A. September 12, 2002) ("SSR 02-01p").  Although under the revised guidelines, obesity is no longer a separate listed impairment; instead, the Listing of Impairments now contains guidelines pertaining to obesity in the prefaces to the sections for the musculoskeletal (§ 1.00Q), respiratory (§ 3.00I) and cardiovascular system (§ 4.00I(1))[12] listings.  *See* Revised

---

[11] Social Security Rulings are agency rulings "published under the authority of the Commissioner of Social Security and are binding on all components of the Administration.  These ruling represent precedential final opinions and orders and statements of policy and interpretations that [the SSA] ha[s] adopted."  20 C.F.R. § 402.35(b)(1) (2000) (bracketed text added).

[12] SSR 02-01p provides for addressing obesity in relation to the cardiovascular system under 20 C.F.R. Pt. 404, Subpt. 1, App. 1, § 4.00F.  Since SSR 02-01p was issued on September 12, 2002, however, the cardiovascular system section of the Listing of Impairments was amended and obesity in relation to the cardiovascular system is now addressed under § 4.00I(1).

Medical Criteria for Determination of Disability, Endocrine System and Related Criteria,

64 Fed. Reg. 46122, 46123 (Aug. 24, 1999).  In deleting § 9.09, the SSA explained that

> we deleted listing 9.09 because our experience adjudicating cases under this
> listing indicated that the criteria in the listing were not appropriate indicators of
> listing-level severity.  In our experience, the criteria in listing 9.09 did not
> represent a degree of functional limitation that would prevent an individual from
> engaging in any gainful activity.  However, even though we have deleted listing
> 9.09, we made some changes to the listings to ensure that obesity is still
> addressed in our listings.

SSR 02-01p, 2000 WL 628049 *1.

In particular, the SSA instructs that

> we consider obesity to be a medically determinable impairment and remind
> adjudicators to consider its effects when evaluation disability.  The provisions
> also remind adjudicators that the combined effects of obesity with other
> impairments can be greater than the effects of each of the impairments
> considered separately.  They also instruct adjudicators to consider the effects of
> obesity not only under the listings but also when assessing a claim at other steps
> of the sequential evaluation process, including when assessing an individual's
> residual functional capacity.

SSR 02-01p, 2000 WL 628049, *1.

The paragraphs concerning the musculoskeletal and respiratory systems are essentially

identical, stating as follows:

> Effects of obesity. Obesity is a medically determinable impairment that is often
> associated with disturbance of the musculoskeletal system,[13] and disturbance of
> this system can be a major cause of disability in individuals with obesity. The
> combined effects of obesity with musculoskeletal  impairments can be greater
> than the effects of each of the impairments considered separately. Therefore,
> when determining whether an individual with obesity has a listing-level
> impairment or combination of impairments, and when assessing a claim at other
> steps of the sequential evaluation process, including when assessing an
> individual's residual functional capacity, adjudicators must consider any
> additional and cumulative effects of obesity.

---

[13] Substituted for the phrase "musculoskeletal system" in § 3.00I is "respiratory system."

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00Q.

As for the effect of obesity of the cardiovascular system, the regulations provide

> [o]besity is a medically determinable impairment that is often associated with disorders of the cardiovascular system.  Disturbance of this system can be a major cause of disability if you have obesity.  Obesity may affect the cardiovascular system because of the increased workload the additional body mass places on the heart.  Obesity may make it harder for the chest and lungs to expand.  This can mean that the respiratory system must work harder to provided needed oxygen.  This in turn would make the heard work harder to pump blood to carry oxygen to the body.  Because the body would be working harder at rest, its ability to perform additional work would be less than would otherwise be expected.  Thus, the combined effects of obesity with cardiovascular impairments can be greater than the effects of each of the impairments considered separately.  We must consider any additional and cumulative effects of obesity when we determine whether you have a severe cardiovascular impairment or a listing-level cardiovascular impairment (or a combination of impairments that medically equals the severity of a listed impairment) and when we assess your residual functional capacity.

20 C.F.R. Pt. 405, Subpt. P, App. 1, § 4.00I1.

Furthermore, SSR 02-01p pertains to claims filed and pending final determination,

whether at any level of the administrative review process, or before federal court, as of

October 25, 1999.  SSR 02-01p, 2000 WL 628049 *7.

In the instant case, as Plaintiff's disability benefits claim, initially filed on August

6, 1996, remained pending after the effective date of SSR 02-01p, Plaintiff's claim

should be evaluated based on the revised regulations.  *See Brown v. Barnhart*, 370

F.Supp.2d 286, 291 (D.D.C. 2005) (holding in assessing disability benefits claim, ALJ

required to apply regulation's Listing of Impairments in effect on date of decision, rather

than listing in effect on date claimant's application was filed).  Accordingly, in

considering the Plaintiff's individual severe impairments, including arthritis,

hypothyroidism, hypertension, diabetes, and depression, the court also considers the

impact of Plaintiff's obesity on Plaintiff's arthritis and hypertension.  Based on such

review, the court finds substantial evidence in the record supports the ALJ's finding that

Plaintiff was not disabled.

The ALJ determined that Plaintiff's arthritis is, within the meaning of the

applicable regulations, severe, but that Plaintiff's condition was not so severe as to meet

the criteria of any of the impairments set forth in the Listing of Impairments.  (R. 25).

The relevant Listing of Impairments for Plaintiff's arthritic condition include §§ 1.02

(major dysfunction of a joint), 1.03 (reconstructive surgery or surgical arthrodesis of a

major weight-bearing joint), 1.04 (disorders of the spine), 1.08 (soft tissue injury) and

11.14 (peripheral neuropathies).[14]  In particular, the criteria for disability based on major

dysfunction of a joint due to any cause, including arthritis, require that such dysfunction

be

> characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motions of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joints(s).  With:
> A.  Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b; or
> B.  Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow or wrist-hand), resulting in an inability to perform fine and gross movements effectively, as defined in 1.00B2c.

---

[14] The ALJ referenced as relevant to Plaintiff's arthritis claim Listing of Impairments §§ 1.02 ("§ 1.02") ([a]ctive rheumatoid arthritis and other inflammatory arthritis), 1.03 ("§ 1.03") ([a]rthritis of a major weight bearing joint (due to any cause)), 1.04 ("§ 1.04") ([a]rthritis of one major joint in each of the upper extremities (due to any cause)), 1.05 ("§ 1.05") ([d]isorders of the spine), and/or 1.08 ("§ 1.08") (osteomyelitis or septic arthritis (established by x-ray).  (R. 20).  Effective as of February 19, 2002, however, these listed impairments were revised and such revisions were in effect on December 6, 2002, the date the Appeals Council denied Plaintiff's request for review and, thus were considered by the Appeals Council in denying Plaintiff's request.  (R. 6) (stating "[t]he new regulations do not provide a basis to change the Administrative Law Judge's decision.").  (R. 6).

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.02 (2006).

In the instant case, there record is devoid of any indication that Plaintiff's foot impairment is attributed to arthritis, or rendered Plaintiff unable to ambulate effectively, as required under § 1.02A.  To the contrary, upon examining Plaintiff on November 12, 1997, Dr. Azeb described Plaintiff's gait as "normal."  (R. 210).  Similarly, although the wrist and hand are identified as major joints referred to in § 1.02 B, Dr. Azeb found Plaintiff's fine movements intact, and grip reflexes and muscle strength were +5 bilaterally  (R. 210).  Although Dr. Azeb opined on November 12, 1997, that Plaintiff's hand swelling was likely due to rheumatoid arthritis or osteoarthritis and stated "maybe lab work for rheumatoid arthritis or rheumatoid factor with sedimentation rate would be helpful to determine if there is any flare-up of her arthritis kind of symptoms," the record does not show that any of the tests required to establish the criteria in section B, *supra,* were ever performed on Plaintiff.  (R. 210).

Without establishing that Plaintiff met the criteria set forth in § 1.02A or B, as was Plaintiff's burden, *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980), the court finds there was substantial evidence to support the ALJ's decision that Plaintiff was not disabled pursuant to § 1.02 of the listing impairments.

Disability may also be established based on reconstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively where effective ambulation does not recur or is not expected to recur for 12 months from the onset date.  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.03.  However, in the instant case, there is no evidence that Plaintiff underwent any reconstructive surgery or surgical

arthrodesis[15] of any major weight-bearing joint resulting in any inability to effectively

ambulate.  Although Plaintiff reported to Dr. Azeb that in 1972, she underwent

reconstructive surgery of her right hand to repair two fingers she injured in a machine at

work, (R. 209-10), and although the hand and wrist are considered under the

regulations as major weight-bearing joints, there is no indication that such

reconstructive surgery was necessitated by arthritis, nor had any effect on Plaintiff's

ability to effectively ambulate.  The incision and drainage procedure Plaintiff underwent

on October 17, 1998 was necessitated by an ulcer on Plaintiff's left foot, rather than by

arthritis, (R. 300), and Plaintiff does not suggest otherwise.  Moreover, although the

incision and drainage procedure for Plaintiff's foot problem did interfere with Plaintiff's

ability to stand for long periods of time as well as to walk, the evidence establishes that

such condition would last less than one year.  *See* Dr. Krasnoff' Report (R. 413-14)

(reporting Plaintiff's impairment not expected to last for at least one year); Dr.

Davidson's Report (R. 415-16) (Plaintiff's impairment expected to last for four weeks

following surgical removal of foreign body (part of a syringe needle) in Plaintiff's left

foot).  Plaintiff has thus failed to establish disability based on any reconstructive surgery

necessitated by arthritis of any major weight-bearing joint.

        As to Plaintiff's claimed back arthritis, the criteria to establish disability based

osteoarthritis of the spine requires evidence of one of the following: (1) nerve root

compression, or (2) spinal arachnoiditis, or (3) lumbar spinal stenosis.  20 C.F.R. Pt.

---

[15] The term "arthrodesis" refers to "a surgical procedure also known as joint fusion.  The goal of arthrodesis is to provide pain relief, restore skeletal stability, and improve alignment in people with advanced arthritis."  *Taken from* "What is Arthrodesis?", *available at* http://arthritis.about.com/od/surgicaltreatments/g/arthrodesis.htm.

404, Subpt. P, App. 1, § 1.04 (2006).  The record again is devoid of any evidence establishing Plaintiff was diagnosed with any of these three conditions.  Rather, a November 12, 1997 X-ray of Plaintiff's lumbosacral spine detected only anterior spurs and facet joint sclerosis, but no other abnormalities.  (R. 206).  Plaintiff has thus failed to establish disability based on arthritis of her spine under § 1.04.

Insofar as Plaintiff's left foot ulcer, osteomyelitis, right arm cellulitis, or the presence of a part of a syringe needle in Plaintiff's left foot requiring surgical removal qualify as "soft tissue injuries" under § 1.08, there is no indication that such conditions were so severe as to render Plaintiff disabled.[16]  As relevant, § 1.08 provides for disability based on a soft tissue injury of an upper or lower extremity "under continuing surgical  management, as defined in 1.00M, directed toward the salvage or restoration of major function, and such major function was not restored or expected to be restored within 12 months of onset."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.08.  Nothing in the instant record indicates that Plaintiff's left foot ulcer, osteomyelitis, right arm cellulitis, or the presence of a syringe needle fragment in Plaintiff's left foot requiring surgical removal interfered with the major function of any upper or lower extremity such that, even with surgical management, such function would not be restored within 12 months. As such, the record fails to establish disability under § 1.08.

---

[16] Although at the time of the ALJ's decision, § 1.08 provided for disability based on osteomyelitis or septic arthritis, established by X-ray, see 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.08 (1999), the ALJ found the evidence failed to establish that Plaintiff's left foot osteomyelitis and right arm cellulitis met the Act's twelve-month durational requirement and, as such, could not support a disability claim.  (R. 20). Upon review, the Appeals Council specifically stated it considered the amended regulations, effective as of February 19, 2002, implementing the new listing for musculoskeletal and related impairments. (R. 6).  As such, the court reviews the ALJ's decision in accordance with § 1.08, as amended to now provide for disability based on soft tissue injury of an upper or lower extremity.

The record further supports the ALJ's determination that Plaintiff is not disabled by peripheral neuropathies.  (R. 27).  In particular, 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.14 (1999) provides for disability when peripheral neuropathies are accompanied by "disorganization of motor function as described in 11.04B, in spite of the prescribed treatment," and § 11.04B requires "[s]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.04B.

Here, nothing in the record established Plaintiff suffered with "sustained disturbance of gross and dexterous movements, or gait and station."  In fact, Dr. Azeb noted that her gait was normal. (R. 210).  As such, the court finds the ALJ's denial of benefits under § 11.14 was also supported by substantial evidence.

Furthermore, despite repeated references to Plaintiff's need to lose weight, nothing in the record indicates that Plaintiff's overweight is, in any way, exacerbating the arthritis in her hands or spine.  As such, there are insufficient additional effects attributed to Plaintiff's asserted obesity to establish disability based on Plaintiff's arthritis.

With regard to Plaintiff's hypertension, § 4.03 of the Listing of Impairments provides for disability where there is evidence of chronic heart failure, in accordance with § 4.02, or ischemic heart disease, in accordance with § 4.04.  In the instant case, however, nowhere in the record is there any mention of Plaintiff suffering from either chronic heart failure or ischemic heart disease, or any cardiovascular disease aside from high blood pressure.  Rather, the record demonstrates that Plaintiff's high blood pressure has responded well to medication and is stable. (*See* R. 300 (Dr. Krasnoff

describing Plaintiff's blood pressure on November 24, 1998 as "stable").   Nor is there

any basis on which to find that Plaintiff's excess weight has significantly contributed to

any additional cumulative effects of Plaintiff's hypertension, as provided for under §

4.00I.1.  As such, the ALJ's determination that Plaintiff's hypertension is not of a level of

severity required for a finding of disability is supported by the record.

As for Plaintiff's hypothyroidism, the Listing of Impairments instructs that the

proper method to assess whether a claimant is disabled based on a thyroid disorder is

to "[e]valuate the resulting impairment under the criteria for the affected body system."

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 9.02.  Hypothyroidism refers to "any state in

which thyroid hormone production is below normal. . . .  Because thyroid hormone

affects growth, development, and many cellular processes, inadequate thyroid hormone

has widespread consequences for the body."  *Taken from* Hypothyroidism, *available at*

http://www.medicinenet.com/hypothyroidism/article.htm.  Significantly, in the instant

case, although Plaintiff's history of hypothyroidism is well-documented, she does not

allege, nor does the record contain any evidence, that Plaintiff's hypothyroidism has

caused any symptoms, resulted in any physical or mental consequences, or had any

impact on Plaintiff's ability to perform work-related activities.  Rather, the record

establishes that Plaintiff's hypothyroidism is controlled with medication, Synthroid.  (See

*e.g.*, R. 300 (renewing Synthroid prescription and increasing dosage)).  Nor has Plaintiff

alleged she suffers any adverse side effects from the Synthroid.   Accordingly, the

record fails to establish that Plaintiff's hypothyroidism is a disabling condition.

The criteria for disability based on diabetes mellitus are provided under Listing of

Impairments § 9.08.  Specifically, to be disabled based on diabetes mellitus, the

condition must have been accompanied by either

> A. Neuropathy demonstrated by significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C); or
> B. Acidosis [(excessive acid in body fluids)] occurring at least on the average of once every 2 months documented by appropriate blood chemical tests (pH or pCO2 or bicarbonate levels); or
> C. Retinitis proliferans [(detached retina)]; evaluate the visual impairment under the criteria in 2.02, 2.03, or 2.04.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 9.08 (bracketed text added).

In the instant case, although Plaintiff was diagnosed with neuropathy secondary to diabetes which likely caused the burning sensation in her feet, (R. 184, 261, 263, 332), the medical evidence of record does not establish the neuropathy caused "sustained disturbance of gross and dexterous movements, gait or station" as required by § 9.08(A).  Although upon examining Plaintitff on November 12, 1997, Dr. Azeb attributed Plaintiff's back pain to diabetic amyotrophy, a type of neuropathy caused by diabetes, Plaintiff's gait was, nevertheless, normal, (R. 210), establishing that Plaintiff's neuropathy was not of the requisite level of severity.  Further, in his "Medical Report for Determination of Disability," Dr. Dandona determined Plaintiff suffered from neuropathy, but noted Plaintiff was capable of performing sedentary work, which the form defined as requiring "use of hands for manipulation."  (R. 392).  Dr. Dandona thus did not determine that Plaintiff's neuropathy resulted "in sustained disturbance of gross and dexterous movements," as required under § 9.08A.  As such, substantial evidence in the record supports the ALJ's determination that Plaintiff's neuropathy was not of the severity required by Listing § 9.08(A).  Nor is there any evidence of acidosis as required under § 9.08(B), or retinitis proliferans as required under § 9.08(C).  Rather, on

November 12, 1997, Dr. Azeb concluded there was "no evidence of diabetic retinopathy at all."  (R. 210).  This record thus supports the ALJ's finding that Plaintiff did not suffer from diabetes mellitus of a severity necessary to be disabled under § 9.08.

12.04 (affective disorders).

    The ALJ also properly found that Plaintiff's alleged depression did not meet the criteria set forth under the relevant section of the Listing of Impairments, *i.e.*, § 12.04 (affective disorders).  Specifically, disability based on depression requires medically documented persistence, either continuous or intermittent, of one of the following:

    a.    Anhedonia or pervasive loss of interest in almost all activities; or
    b.    Appetite disturbance with change in weight; or
    c.    Sleep disturbance; or
    d.    Psychomotor agitation or retardation; or
    e.    Decreased energy; or
    f.    Feelings of guilt or worthlessness; or
    g.    Difficulty concentrating or thinking; or
    h.    Thoughts of suicide; or
    i.    Hallucinations, delusions, or paranoid thinking; or

20 C.F.R. Pt. 404 Subpt. P, App. 1 § 12.04A(1).

Further, such depressive syndrom must result in at least two of the following:

    1.    Marked restriction of activities of daily living; or
    2.    Marked difficulties in maintaining social functioning; or
    3.    Marked difficulties in maintaining concentration, persistence or pace; or
    4.    Repeated episodes of decompensation; each of extended duration;

20 C.F.R. Pt. 404 Subpt. P, App. 1 § 12.04B.

    In this case, the medical evidence demonstrates that although both Dr. Azeb and Dr. Krasnoff reported Plaintiff appeared depressed and became tearful during physical examinations conducted on November 12, 1997 (R. 210 (Dr. Azeb)) and November 24,

1998 (R. 396 (Dr. Krasnoff)), neither physician opined that Plaintiff demonstrated any of the symptoms required under Listing 12.04 for a disability determination based on depression.  Further, although Plaintiff is taking amitriptyline, an antidepressant, the record establishes such medication was prescribed as a sleep aid (R. 216, 335), which is a medically accepted use.[17]  In response to the ALJ's questioning at the hearing Plaintiff admitted that she does not see a psychiatrist, psychologist or counselor to assist in her treatment of depression. (R. 66).  Nor is there any evidence in the record that any of Plaintiff's physicians ever recommended, encouraged or referred Plaintiff for such help.  As such, the ALJ's determination that Plaintiff's depression was not of the severity required by Listing 12.04 is supported by the record.

The ALJ's determination that Plaintiff does not suffer from any individual impairment that meets or equals the level of severity of any of the impairments included in the Listing of Impairments is thus supported by the record.  Further, the ALJ also considered the cumulative effect of Plaintiff's multiple impairments, including non-sever impairments (R. 18), as required.  *See Koseck v. Secretary of Health and Human Services*, 865 F.Supp. 1000, 1010 (W.D.N.Y. 1994) (discussing requirement that ALJ consider effects of all impairments, including non-severe impairments, as the cumulative effect of multiple impairments "could be equally disabling as a listed impairment").  Evidence in the record supporting this finding includes the report of Dr. Dandona, who, as of April 9, 1998, began following Plaintiff at the diabetes center  and who was aware

---

[17] "Amitriptyline is used to relieve symptoms of depression such as feelings of sadness, worthlessness, or guilt; loss of interest in daily activities; changes in appetite; tiredness; sleeping too much; insomnia; and thoughts of death or suicide.  Amitriptyline is also sometimes used to treat certain types of pain."  *Taken from* Amitriptyline, *available at* http://www.drugs.com/amitriptyline.html.

of Plaintiff's numerous diagnoses, including diabetes mellitus, nephropathy, neuropathy, menopause, obesity and hypothyroidism, yet, on the "Medical Report for Determination of Disability," completed on November 5, 1998, reported Plaintiff was capable of performing sedentary work, defined as lifting 10 pounds occasionally, standing and walking two hours and sitting six hours in an eight-hour workday, and had use of hands for manipulation. (R. 392). Dr. Dandona also reported  Plaintiff was not considered to have a marked restriction of daily activities and, although  Plaintiff was not anticipated to recover from her impairments, Plaintiff could control her impairments by following prescribed treatments. (R. 393).

Furthermore, before the Appeals Council was Dr. Krasnoff's report of January 19, 1999, in which Dr. Krasnoff, based on her November 24, 1998 examination, lists as Plaintiff's diagnoses diabetes, arthritis, hypothyroidism, history of osteomyelitis, and hypertension. (R. 413). Dr. Krasnoff also stated that, at that time, an open ulcer at the base of Plaintiff's third toe on her left foot rendered Plaintiff unable to stand on the foot, that Plaintiff's daily activities were markedly restricted, and that Plaintiff was unable to perform any type of work. (R. 413-14). Nevertheless, Dr. Krasnoff reported that Plaintiff's ability to relate to other people was not seriously impaired, that significant improvement of Plaintiff's impairments was expected through medical treatment or rehabilitation, and that Plaintiff's impairments were not expected to last for one year or more. (R. 414). The findings in Dr. Krasnoff's report are thus consistent with the Appeals Council's determination that such evidence provided no basis for changing the ALJ's decision. (R. 6).

As such, the ALJ's determination that Plaintiff's impairments did not, either singly

or in combination, met or equal the severity of any listed impairment is supported by the record.  The court next considers whether substantial evidence in the record supports the ALJ's determination that Plaintiff retained the residual functional capacity for her prior work as an office manager/secretary/billing clerk.

### 4.    **"Residual Functional Capacity" to Perform Past Work**

Once the ALJ found that Plaintiff's impairment was not of the severity which equaled a listed impairment, she determined that Plaintiff possessed the residual functional capacity to perform her past work, which was sedentary. (R. 22).  "Residual functional capacity" for past relevant work is defined as the capability to perform work comparable to the applicant's past substantial gainful activity.  *Cosme v. Bowen*, 1986 WL 12118, at *3 (S.D.N.Y. Oct. 21,1986).  Significantly, a finding that a claimant can perform past relevant work requires a determination that such claimant is not disabled, without any consideration as to the claimant's vocational factors of age, education and work experience, or whether the past relevant work exists in significant numbers in the national economy.  20 C.F.R. §§ 404.1560(b)(3) and 416.960(b)(3).

In the instant case, the ALJ found that Plaintiff has the residual functional capacity to perform the requirements of work, with the exception of standing or walking for more than two hours in an eight-hour workday, lifting more than ten pounds occasionally, and performing a job requiring more than moderate concentration.  (R. 26-27).  The ALJ next observed that Plaintiff's past relevant work as an office manager/secretary/billing clerk, as described by Plaintiff, required her to sit approximately six hours, stand for one hour, and walk about for one hour in an eight-

hour workday, and to bend occasionally, but required no lifting.  (R. 26 (referencing R.

133, Vocational Report completed by Plaintiff in connection with her disability benefits

application)).  The ALJ further observed that Plaintiff, at the administrative hearing, had

stipulated to the description of her past work as consistent with the descriptions for the

positions of secretary and billing clerk as set forth in the Dictionary of Occupational

Titles ("DOT").  (R. 26 (referencing R. 150-57 - DOT Job Descriptions for secretary and

billing clerk)).  According to the ALJ, such work "required primarily sitting, occasional

walking and standing, and minimal little lifting," was skilled or semi-skilled, and required

good concentration which was not precluded by Plaintiff's concentration limitation which

the ALJ characterized as "minimal."  (R. 26 (referencing Psychiatric Review Technique

form (R. 29-31) on which the effects of Plaintiff's depressive disorder is reported as

having only a "slight" effect on Plaintiff's mental functioning)).  This finding is supported

by substantial evidence in the record.

Plaintiff has not challenged the ALJ's finding the Plaintiff stipulated that her

previous work as an office manager/secretary/billing clerk was consistent with the

DOT's descriptions for the positions of secretary and billing clerk.  Further, both

positions are characterized in the DOT as having a physical exertion requirement for

sedentary work.  (R. 151 (secretary) and R. 152 (billing clerk)).  According to the

relevant regulations,

> Sedentary work involves lifting no more than 10 pounds at a time and
> occasionally lifting or carrying articles like docket files, ledgers and small tools.
> Although a sedentary job is defined as one which involves sitting, a certain
> amount of walking and standing is often necessary in carrying out job duties.
> Jobs are sedentary if walking and standing are required occasionally and other
> sedentary criteria are met.

20 C.F.R. § 404.1567(a).

Here, the record supports the ALJ's finding that despite Plaintiff's multiple impairments, Plaintiff retained the residual functional capacity for her past relevant work which was sedentary.

Specifically, on December 5, 1997, State agency medical consultant Dr. Miller opined that despite Plaintiff's physical impairments, Plaintiff could lift and carry up to 25 pounds frequently and up to 50 pounds occasionally, stand and walk, or sit, for six hours in an eight-hour workday and had an unlimited ability to push or pull and had no postural, manipulative, visual, communicative or environmental limitations.  (R. 226-29). Dr. Miller's assessment was affirmed on February 6, 1998 by State agency Review Physician Mathew K. Alukal, M.D.  (R. 232).  Further, on November 5, 1998, Dr. Dandona, who had been treating Plaintiff's diabetes since April 9, 1998, reported that despite Plaintiff's diagnosed diabetes, nephropathy, neuropathy, hypothyroidism, menopause and obesity, Plaintiff could perform sedentary work, defined as "lift 10 lbs. occasionally, stand/walk 2 hrs. a day, sit 6 hours a day, use of hands for manipulation." (R. 392).  Dr. Dandona further indicated Plaintiff did not have a marked restriction of her daily activities.  (R. 393).  This evidence thus supports the ALJ's determination that Plaintiff could perform her past relevant work.

Plaintiff argues that in reaching the conclusion that she remained capable of performing her past relevant work as an office manager/secretary/billing clerk, the ALJ failed to consider the opinions of Dr. Lascola, who had treated Plaintiff's osteomyelitis, as well as Dr. Krasnoff's report, dated January 19, 1999 and based on a November 24, 1998 examination, in which Dr. Krasnoff states that Plaintiff is unable to do any type of

work and her activities of daily living are markedly limited.  (R. 413-14).  Plaintiff's

Memorandum at 14.  According to Plaintiff, the ALJ ignored such information because it

was not favorable to the Commissioner's conclusion that Plaintiff is not disabled. *Id*. at

14-15.  Plaintiff is, however, mistaken.

As to Dr. Lascola's report, dated January 21, 1999, the record does not indicate

that Dr. Lascola treated Plaintiff after October 23, 1998 when Plaintiff was discharged

from Millard Fillmore Hospital following treatment for the ulceration of her left foot.[18]  (R.

371-82).  That Dr. Lascola only diagnosed Plaintiff with a foot ulceration indicates that

his findings that Plaintiff was markedly restricted as to her daily activities and was

unable to perform any work were limited to Plaintiff's physical abilities while she

recovered from her foot ulceration.  This is consistent with the report of Dr. Krasnoff,

Plaintiff's treating physician, that Plaintiff had a history of a toe ulcer and osteomyelitis,

was markedly restricted in her ability to perform daily activities and was unable to do

any type of work, but that significant improvement was likely through medical treatment

and Plaintiff's impairments were not expected to last for at least one year.  (R. 413-14).

There is thus no merit to Plaintiff's assertion that the ALJ ignored information that was

favorable to a finding that Plaintiff is disabled.

Nor did the ALJ fail to properly apply the treating physician's rule, which provides

that if the opinion of the treating physician is supported by medically acceptable

techniques and results from frequent examinations, and the opinion finds support in the

administrative record, the treating physician's opinion will be given controlling weight.

---

[18] *See* Facts, *supra*, at 17, n. 7, regarding Dr. Lascola's statement that Plaintiff suffered an ulceration of her *right* foot.

20 C.F.R. § 404.1527(d); 20 C.F.R. § 416.927(d); *Schisler v. Sullivan*, 3 F.3d 563, 567

(2d Cir. 1993).  Generally, more weight also is given "to the opinion of a specialist about

medical issues related to his or her area of specialty than to the opinion of a source who

is not a specialist."  20 C.F.R. § 404.1527(d)(5); 20 C.F.R. § 416.927(d)(5); *Schisler*,

*supra*, at 567.

Here, the opinion of Dr. Krasnoff, Plaintiff's treating physician, rendered January

19, 1999, is consistent with the ALJ's determination that Plaintiff was not disabled

because Dr. Krasnoff's opinion that Plaintiff was markedly restricted as to her daily

activities and was unable to perform her past work or any other type of work was

specifically limited to the time during which Plaintiff recovered from her foot ailments,

including the ulceration of her left foot, which was not expected to persist for at least

one year.  (R. 413-14).  Dr. Lascola's opinion was similar insofar as he found Plaintiff

markedly restricted as to daily activities and unable to perform her usual work or any

other type of work, but such opinion was limited to the impairment posed by Plaintiff's

foot ulceration from which Plaintiff was expected to recover.  (R. 390-91).  Significantly,

Dr. Lascola did not provide any response to the question as to whether Plaintiff's

impairment was expected to last for more than one year.  (R. 391).  Furthermore, on

January 20, 1999, Dr. Davidson, a podiatrist, opined that Plaintiff, based on the

presence of a piece of a syringe needle embedded in her left foot, which was scheduled

to be surgically removed from the foot on February 2, 1999, was at that time markedly

restricted as to her daily activities, and was not able to perform her usual work, but

could perform other work, was expected to recover at least in part, significant

improvement with treatment was expected, and that such impairment was not expected

to last for more than one year but, rather, would continue for four weeks following the scheduled surgery.  (R. 415-16).  These opinions are thus consistent with the ALJ's determination that Plaintiff was not disabled.

Plaintiff also argues that the ALJ failed to perform a requisite function-by-function analysis as to whether Plaintiff is capable of sedentary work.  Plaintiff's Memorandum at 16.  In particular, Plaintiff maintains that such an analysis would have revealed that the functional limitation posed by Plaintiff's hand pain and arthritis render Plaintiff unable to perform her past relevant work which required her to type.  (R. 16-17).  The evidence on which Plaintiff relies in support of this argument, however, fails to establish that Plaintiff is unable to sufficiently use her hands for her past relevant work.

In particular, Plaintiff relies in support of such argument on her subjective complaints of hand pain caused by arthritis.  Plaintiff's Memorandum at 16 (citing R. 120 (Disability Report prepared by Plaintiff in which Plaintiff explains arthritis pain in Plaintiff's hands and back render Plaintiff unable to type or manipulate her fingers); R. 60-61 (Plaintiff testifying at administrative hearing that swollen finger joints rendered her unable to open jars and she had decreased hand strength caused by numbness); R. 175, 184, and 218 (various treatment notes reported Plaintiff complains of arthritic pain in her hands)).  The ALJ, however, found Plaintiff's subjective claims of disabling symptoms and limitations not fully credible.  (R. 25, 27).

While a plaintiff's subjective complaints are not alone sufficient to support a finding of disability, such complaints must be accorded weight when they are accompanied by "evidence of an underlying medical condition" and an "objectively determined medical condition [which is] of a severity which can reasonably be expected

to give rise to the alleged pain." *Cameron v. Bowen*, 683 F.Supp. 73, 77 n.4 (S.D.N.Y. 1984).  The ALJ is not, however, required to "accept without question the credibility of such subjective evidence." *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979).  Rather, "[t]he ALJ has discretion to evaluate the credibility of the claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." *Marcus*, *supra*, at 27.

Here, the ALJ observed that Plaintiff left her two most recent jobs for reasons other than her disability, including, the death of the company's owner, and the relocation of the other company out of town.  (R. 25).  Significantly, Plaintiff has not worked since May, 1993, yet Plaintiff claims "her condition first started to bother her in 1996."  (R. 25). The ALJ also cites Plaintiff's activities which include cooking, shopping "when accompanied," and ending to "light household chores" as evidence of her ability to perform sedentary work.  (R. 25).  The ALJ further observed (R. 25) that Plaintiff's testimony that she does not cook (R. 70), is inconsistent with statements in her disability report that she cooks for herself, dusts and does slow cleaning.  (R. 123).  Furthermore, more than one physician examined Plaintiff and found her capable of finger manipulations.  (See R. 210 (Dr. Azeb reporting on November 12, 1997 that although Plaintiff's hand swelling was likely attributed to osteoarthritis, Plaintiff's fine movements were intact, grip reflexes and muscle strength were +5 bilaterally, no "arthritis kind of deformities" were observed about Plaintiff's hands); R. 392 ("Medical Report for Determination of Disability," completed by Dr. Dandona on November 5, 1998, indicating Plaintiff was capable of performing sedentary work, defined as lifting 10 pounds occasionally, standing and walking two hours and sitting six hours in an eight-

45

hour workday, and "*use of hands for manipulation*" (italics added))).  Significantly absent from the record is any indication that Plaintiff's hand arthritis is sufficiently severe to interfere with any hand manipulations.  Accordingly, the ALJ did not improperly discredit Plaintiff's subjective claim that arthritic pain in her hands rendered her unable to perform her past relevant work.

Upon its review, the court finds there is substantial evidence in the record to support the ALJ's ultimate conclusion that Plaintiff is capable of performing sedentary work, specifically her past relevant work as an office manager/secretyary/billing clerk.


### 5.    Suitable Alternative Employment in the National Economy

If the applicant is unable to perform any past work, the commissioner will consider the individual's "residual functional capacity," age, education and past work experience in order to determine whether the applicant can perform any alternative employment.  20 C.F.R. §§ 404.1520(f), 416.920(f).  *See also Berry,* 675 F.2d at 467 (where impairment(s) are not among those listed, claimant must show that he is without "the residual functional capacity to perform [his] past work").  Where, however, the claimant is properly found capable of performing past relevant work, there is no need to continue to the fifth step of determining whether suitable alternative employment is available in the national economy.

Here, the ALJ found Plaintiff capable of performing past relevant work.  As that finding is supported by the record, it is unnecessary to consider whether Plaintiff can perform any alternative employment.

## **CONCLUSION**

Based on the foregoing, Defendant's motion is GRANTED, and Plaintiff's

motion is DENIED.  The Clerk of the Court is directed to close the case.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

Dated:      October 24, 2006
              Buffalo, New York